17 A.3d 754

Eric ESPINOSA

v.

STATE of Maryland.

No. 888, Sept. Term, 2010.

Court of Special Appeals of Maryland.

April 5, 2011.

356

Aindrea M. Conroy & Paul Kemp (Ethridge, Quinn, Kemp, McAuliffe, Rowan & Hartinger, on the brief), Rockville, MD, for appellant.

Michelle W. Cole (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: EYLER, JAMES R., ZARNOCH, ARRIE W. DAVIS (Retired, specially assigned), JJ.

EYLER, JAMES R., J.

During a civil jury trial in the Circuit Court for Montgomery County, the court found Eric Espinosa, appellant, guilty of committing direct criminal contempt and summarily sanctioned him to 10–days incarceration. On appeal, appellant contends that summary proceedings were not warranted because his conduct did not prevent the civil trial from proceeding to verdict, and maintains that, in any event, the contempt finding was based on extrinsic evidence not within the personal knowledge of the court; thus, it should have been treated, if at all, as constructive, rather than direct, contempt. Further challenging the court's finding of direct contempt, appellant argues that he was denied due process in that he was not given notice of the conduct the court considered to be contemptuous, and was denied his right to counsel. The State contends the finding of contempt should be affirmed. As explained below, we will reverse.

### Factual Background

This case began as a civil action instituted on December 10, 2008, by Loflane Joint Venture ("Loflane") against National Institute of Vehicle Dynamics ("NIVD") for breach of a commercial lease. Loflane is a landlord/lessor of commercial warehouse space. NIVD is a corporation that provides driver training and instruction to motorists. Appellant, a District of Columbia police officer, acts as executive director for NIVD.

In an effort to expand its operations into Montgomery County, NIVD entered into a commercial lease, dated April 30, 2008, with Loflane with the intention of using the leased space, located at 649 Lofstrand Lane, as its headquarters and as a training site. In its suit, Loflane alleged, *inter alia*, that NIVD neglected its obligation to pay rents under the terms of

the lease as it had vacated the leased premises and owed back-rent, late charges, and other fees. The complaint[1] also alleged that NIVD and appellant had made alterations to the premises, but did not return the premises to its original condition, as per the terms of the lease. As the payment obligations under the lease were guaranteed by appellant, Loflane also sued appellant as guarantor.

NIVD and appellant defended the suit, and counter-claimed, by contending that NIVD had been constructively evicted from the leased premises due to the presence of leaking water and other contaminating substances entering NIVD's premises. The counter-complaint also alleged that NIVD and appellant had retained engineers and architects to "build out" the premises for their purposes; that appellant and his wife became ill each time they entered the premises; that Loflane was aware of the leaks; and, that appellant had contacted Loflane regarding the leaks, but that Loflane failed to respond.

Loflane answered the counter-complaint by, apparently,[2] claiming that there was never a constant leaking issue in the space; that it never received any complaints about any leaks from appellant; that it never failed to respond to any of appellant's phone calls; that appellant's first mention of a leaking pipe or leaking water occurred after he was sued for possession of the property in November of 2008; and, that NIVD and appellant were now fabricating the complaint of the leaking pipe to avoid their obligations under the lease to pay the rents due.

---

1. Loflane filed a complaint on December 10, 2008, and an amended complaint on May 14, 2010, on which it proceeded to trial.

2. Loflane's answer to the counter-complaint was docketed on February 23, 2009, at tab # 22 in the record. The document connected with that tab number, however, appears to be missing from the record, and was not included in the extract. Thus, we shall paraphrase from the circuit court's opinion the allegations made in the answer to the counter-complaint.

On December 10, 2008, Loflane filed a motion for summary judgment. On February 13, 2009, NIVD and appellant filed an opposition to motion for summary judgment. Attached to the opposition was an affidavit of appellant (dated February 13, 2009) in support of the opposition. In that affidavit, appellant attested to the truth of the allegations in the counter-complaint and in the opposition to Loflane's motion for summary judgment. In addition, appellant swore to the following facts: that shortly after entering into the lease, he noticed water leaking into the premises from the floor above, and that he contacted Loflane but Loflane failed to repair the leaks; that "flakes of rust" were coming off of the ceiling; that he and his wife were "getting nauseated every time" they entered the premises; that his investigation into the upstairs premises revealed that it was in the business of animal testing, and that the cages of the animals were washed out into a "pit where the water leaked" into NIVD's premises; and that the chemicals used to clean the premises above NIVD's were harmful. On April 1, 2009, after a hearing, the court [3] denied the motion.

On January 12, 2010, Loflane renewed its motion for summary judgment. Attached as exhibits to Loflane's renewed motion was, *inter alia*, the transcript of a June 1, 2009, deposition of appellant. NIVD and appellant responded on February 1, 2010, again attaching an affidavit of appellant (dated January 27, 2010) in support of the opposition. In the second affidavit, appellant attested to the following facts, in relevant part, as taken from his affidavit:

3. In early 2008, on behalf of NIVD, I sought to lease office space in Montgomery County for purposes of building out a facility that could be used for advanced driver training, court-mandated driver improvement training, and basic drivers education, as well as for office space.

4. In April, 2008, I was shown warehouse space ... and introduced to HBW Group, [4] whom I understand to be the

---

3. The judge who denied the original motion for summary judgment was not the presiding judge at trial.

4. HBW Group was Loflane's broker and agent.

Building's leasing agent and property manager. I made clear to Herb Patterson of HBW Group NIVD's particular needs, including the fact that the space would be used to train members of the public. HBW Group offered space in bays K and L on the ground floor of the Building, and represented that the space was suitable for NIVD's needs.

5. Based on HBW Group's representations and warranties that the space was habitable and suitable for NIVD's intended uses, I entered into a Commercial Lease Agreement (the "Lease") on behalf of NIVD on April 30, 2008. On that same day, on behalf of NIVD, I wrote a check to HBW Group in the amount of $3,704.25 as a security deposit.

6. NIVD spent approximately $12,000 for architectural work and initial demolition of the leased space and paid a real estate broker commission of $3500. NIVD also paid rent for the space through the month of August, 2008.

7. Shortly after entering into the Lease, I observed water leaking into the space from the [floor] above and pooling on the floor of the space. I contacted HBW and reported the water, but HBW did nothing in response.

8. After installing lighting in the space—there was almost no workable lighting in the space at the time I was shown the space and at the time I signed the Lease—it became apparent that leaking water had been a longtime issue in the space. The ceiling was covered with rust, and flakes of rust began to cover a large portion of the premises, including boxes and other materials that NIVD had moved into the space.[5]

9. On numerous occasions, water leaked from the premises above NIVD's leased space and pooled on the ground. Again, my efforts at seeking assistance from HBW Group went unheeded.

10. In late June, 2008, I visited NIVD's leased space with Toba Greenbaum. After spending a few minutes in the

---

5. Photographs of the alleged rust and boxes were attached as exhibits A and B.

space, both of us became extremely nauseated. I was seized with incredible abdominal pain, accompanied by the sensation of an imminent involuntary bowel movement. Both Ms. Greenbaum and I fled the space, after which our symptoms subsided. Ms. Greenbaum refused to return to the space thereafter.

11. On June 30, 2008, I spoke with Richard Ireland of Biocon, Inc., the tenant in the space immediately above NIVD's space. Mr. Ireland had offered to fix yet another leak that was causing water to run down the wall of NIVD's space and pool on the floor. At that time, Mr. Ireland, a longtime tenant in the Building, informed me that HBW Group "takes their time when it comes to fixing things." Further, when I asked Mr. Ireland why he was using bleach to mop up the water that had pooled on the floor, he informed me, for the first time, that Biocon, Inc. was in the business of pharmaceutical testing on animals, which involved injecting the animals with cancer tumors and then subjecting the animals to various chemotherapy treatments. I subsequently learned that Biocon, Inc. stored hundreds of hazardous chemicals on-site.[6]

12. The leaks continued in the space through July, August and September. (In fact, I had given Mr. Ireland a key to NIVD's space because of the ongoing leaks.) On or about September 8, 2008, a major leak occurred in the space, with water pouring down the wall from Biocon's space and pooling on the floor of NIVD's space to a depth of more than an inch. I called HBW Group on September 8 to complain about the flooding, but did not receive a reply.

13. Following the September flood, I asked Richard Ireland if I could expect the dripping and flooding to stop. He told me that I could not, "because it's an old building."

\* \* \*

---

6. Appellant attached a "true and correct copy of Biocon's Hazardous Chemical List, which [he] obtained from the Maryland Department of the Environment," as Exhibit C.

1[5]. At that point ... having endured constant water intrusion and the September flooding, having become extraordinarily ill in the space, having been informed that HBW Group was unlikely to make any effort to remedy the leaks, having experienced first-hand HBW Group's cavalier attitude toward tenant problems, and knowing that the water invading NIVD's space was from a facility that performed animal testing and used and stored hazardous chemicals, I decided that NIVD could not subject its clients—primarily high-school students—to risk of illness at the Building, nor could NIVD risk constant water damage to its facilities. Therefore, I called HBW Group on several occasions asking to be released from the Lease. I also put a hold on any construction at the space; consequently, although demolition work removed some pre-existing walls and a drop ceiling, nothing was ever built out.

1[6]. I was finally able to arrange a meeting with Joanne Senall [7] of HBW Group, which was held at HBW Group's offices on October 17, 2008. At that time, I explained that the ongoing water leakage, HBW Group's unwillingness to repair the water leaks, my experience with nausea, and Biocon's activities had caused me to conclude that the space was not suitable for habitation or for NIVD's intended use. I asked to be released from the Lease. Ms. Senell refused, explaining that the Building's owners were "very aggressive," were "very well funded" and would "pursue you legally" if NIVD failed to pay rent for the entire lease period.[8]

1[7]. It was only after the October 17 meeting that Loflane Joint Venture filed its action in the District Court for repossession of the property.[9]

---

7. Ms. Senall's surname is spelled inconsistently throughout the record. We shall use this spelling for consistency.

8. Appellant attached a "true and correct copy of Ms. Senall's notes of the meeting, as produced to NIVD during discovery," as Exhibit D.

9. Appellant attached a copy of the complaint as Exhibit E.

1[8]. When I appeared at the [November 12, 2008] hearing, the judge informed me that NIVD could not appear without an attorney. An attorney present in the courtroom offered to help, and advised me that the suit was merely for repossession of the property. The attorney said that if I was willing to turn over the keys, there would be no need to oppose the Complaint or to hire an attorney. I therefore agreed to turn over the keys, which I did promptly thereafter.

On March 22, 2010, the court[10] denied Loflane's renewed motion for summary judgment.

On June 1, 2009, appellant was deposed. During his deposition, the following transpired, in relevant part.

With regard to his marital status, appellant testified as follows:

Q. Are you married?

A. No.

Q. Have you previously been married?

A. Yes.

Q. What's your spouse's name or ex-spouse at this time?

A. It was back in 1993.

Q. I am sorry. You indicated in your Answers to Interrogatories that your wife—

A. Toba Greenbaum. We were actually not married, but we lived together for 13 years.

Q. But at the time that this lawsuit arose you were not married?

A. I've never been married to her.

Q. So you never had a spouse or a wife? You did in 1993?

A. Correct. I was divorced.

Q. Okay.

---

**10.** According to the docket entries, the hearing on Loflane's renewed motion for summary judgment was heard and decided by the judge who later presided over the trial.

A. And then I've been with this woman that I'm referring to.

Q. As your wife?

A. As my wife, yes.

Q. And her name was Toba, T-o-b-a?

A. Toba Greenbaum, yes.

With regard to NIVD's vacation of the leased property, appellant testified:

A. We haven't paid rent for that property since we relinquished custody or we were evicted.

Q. You were evicted?

A. Yes.

Q. So you didn't pay rent . . . ?

A. No.

Q. When did you relinquish the keys to the property?

A. I don't recall.

Q. You have no recollection of when you turned over the keys and vacated the property?

A. Approximately in September [of 2008].

With regard to renovations undertaken by NIVD on the property, appellant testified:

Q. During the course of your possession of the premises . . . was there any construction going on inside the premises? Did you contract for construction, renovation, demolition of the property?

A. Yes.

Q. What types of construction or renovations were done?

A. We did demolition of some walls to the existing structure.

Q. You knocked down walls?

A. We took out a few walls.

\* \* \*

Q. So you demo'd some walls and that was the extent?

A. Correct.

\* \* \*

Q. Did you have permission from Loflane to do the renovations?

A. Yes.

Q. Was the permission written or oral?

A. Written.

Q. Do you have a copy of that?

A. No.

Q. Would NIVD have a copy of the written permission from Loflane?

A. I don't know.

\* \* \*

Q. .... When did the renovations begin?

A. Approximately, May. Late May, early June [of 2008].

With regard to visiting and inspecting the premises prior to leasing it, appellant testified:

Q. .... Prior to leasing the premises ... did NIVD have the opportunity to view the premises or anyone on their behalf?

A. Yes.

Q. Who viewed the premises?

A. Myself and Dan Manoff.

\* \* \*

Q. Who is Mr. Manoff?

A. He's an instructor with [NIVD].

\* \* \*

Q. Do you know what date you would have viewed the premises prior to the rental?

A. I don't recall the date.

Q. Do you remember what month it would have been in?

A. Probably mid April before we signed the lease.

Q. Did you make any observations at that time regarding the premises?

A. None that I was aware of.

Q. Did you see any leaks?

A. Not that I recall.

Q. Did you inspect the entire property, the entire premises, rental premises?

A. It was very dimly lit. A lot of light bulbs were broken out, so when we were in there the lighting was not the best.

Q. Who were you with? Were you with someone from—

A. Hurt Patterson, Bernard Maitz,[11] he was my [leasing] agent. Hurt Patterson I guess would be the partner with HBW.

With regard to the leaking water and his attempts to contact the HBW Group in that regard, appellant testified:

Q. ... [A]s part of your counter-claim you're claiming that there were pre-existing leaks in the premises; is that correct?

A. Yes.

Q. When did you first notice these leaks or leak?

A. Early May I contacted a person at HBW. His name is Coleman, on several occasion about the leaks. And after a few phone calls and a lot of frustration, because he would never return my calls, I then actually was approached by Rich Ireland, who then I found out was with BIOCON. He told me that HBW was not very diligent in fixing problems on the property and he would be assisting me with the leak. And then he volunteered to come down and mop the water with bleach.

\* \* \*

Q. When did this conversation occur?

A. Early May, after the lease was signed.

\* \* \*

Q. When you first noticed the leak or leaks, where were they coming from?

---

11. Bernard "Mizell" is spelled inconsistently throughout the record. We shall use "Mizell" for consistencies' sake. Mr. Mizell was a broker retained by NIVD to find a property to lease for its business.

A. A ... peach wrap which is kind of like a joint. It's called a peach wrap. It comes out of a drain, which was in the ceiling of the unit we rented, coming from the BIOCON property above us.

\* \* \*

A. ... [Richard Ireland] told me that was the cleaning part where they clean the animal cages.

\* \* \*

Q. And you said that you contacted Loflane. Do you recall the date that you first contacted Loflane regarding the leak?

A. It was shortly after the lease was signed.

Q. And this was by phone?

A. Correct.

\* \* \*

Q. And you said you tried to contact Loflane on several occasions. Do you know approximately how many times?

A. I think it was at least eight times [over a period of several months].

\* \* \*

A. And finally in September I met with Joann Snell [sic].

\* \* \*

A. .... I think it was September 27 to be exact. I wrote a letter stating we wanted to be released from the property due to never fixing the leaks and the fact that I was feeling nauseous on the property due to unknown circumstances.

\* \* \*

Q. Did you call anyone outside of Loflane to fix the leak?

A. I was dealing with Richard Ireland from BIOCON and he was working with me.

\* \* \*

Q. The date that you are talking about that Mr. Ireland came down and mopped up—

\* \* \*

Q. ... [Y]ou don't have an exact date on that?

A. No.

* * *

Q. Did you, yourself outside of what Mr. Ireland said, ever determine the cause of the leak.

A. .... I have no idea what caused the leaks. I just know there was standing water on the floor.

With regard to the contaminants that were allegedly entering NIVD's leased premises from Biocon, above, appellant testified:

Q. Did you ever come to find out what was leaking?

A. It was a drain for their animal cages where they would wash them. So I imagine all the excrement from the animals that were causing cancer would be what was leaking into our space.

Q. Okay. Did you ever have the liquid that was leaking from the drain tested.

A. No.

* * *

Q. Did you ever call the EPA regarding the leak?

A. Yes.

* * *

Q. Do you know [if the person who responded from the EPA] did any tests?

A. He walked the premises. He took several pictures of what was going on there. And I asked him if he would occupy the premises. And he told me absolutely not.

Q. But you don't know if he did any tests on the liquid or took a sample?

A. Not that I'm aware of.

* * *

Q. Now, you said you imagine that the water leaking into the premises contained excrement from the animals, but you don't actually know that?

A. No.

Q. So that's your supposition that that's what was leaking into the premises?

A. From the drain where they clean their cages, correct. The fact that Mr. Ireland was talking about mopping it up with bleach, would lead me to believe that.

Q. But Mr. Ireland didn't actually tell you what was leaking into the premises?

A. No.

With regard to the illness that appellant allegedly suffered, and the treatment he allegedly sought, he testified:

Q. Can you describe the nature of the physical harm?

A. When I was in the premises, actually had the feeling of like nausea and like I immediately had to have a bowel movement.

* * *

And I actually exited the building. And once I got out to fresh air, it started to dissipate.

* * *

Q. Do you recall a date?

A. I don't recall. It was probably somewhere June, July, somewhere in there. And I was with Toba at the time.

* * *

Q. And did you seek any medical treatment?

A. I did get a CAT scan of my head and sinus to determine if I had any infections in my sinuses from any exposure that I may have had.

Q. When was the CAT scan done?

* * *

A. Approximately in June, July, August, September.

Q. August or September?

A. In there.

Q. June, July, any time in there?

A. Somewhere in there.

Q. Where was it done?

A. There is neurologist center in Germantown on Bowling Farm Road. I was having headaches also.

\* \* \*

On June 16, 2010, a jury trial began, at which appellant testified. Appellant asserts—and the State does not challenge—that during his testimony, appellant "did not use expletives, showed complete deference to the trial court, and conducted himself in an appropriate manner befitting a court proceeding. [He] also did not disobey any order of court and did not interrupt the proceedings by way of his absence, disrespect or outburst during trial." Appellant's sworn trial testimony, however, was inconsistent as compared to his pretrial sworn affidavits and deposition testimony, as well as inconsistent between his testimony on direct examination and his testimony on cross-examination. In particular, appellant testified to the following.

On direct examination, appellant testified that he engaged Mr. Mizell to find a property for NIVD's business, and Mr. Mizell took him to 649 Lofstrand Lane. After viewing the property, but before signing the lease, appellant spoke with Herb Patterson of HBW Group, Loflane's representative, and explained to Mr. Patterson NIVD's purposes for the space. Appellant also told Mr. Patterson what his plans were for "building out" the space, and Mr. Patterson told appellant that the space was perfect for NIVD's needs.

After NIVD entered into the lease agreement, and appellant guaranteed the agreement, NIVD began some demolition work of the space. Appellant testified that he had informed Loflane that he wished to perform the demolition work and showed the landlord what specific demolition work NIVD was undertaking, and Loflane never told NIVD that the demolition work could not be done or that there were any conditions on demolition. Appellant's counsel asked appellant about a letter dated May 14, 2008, admitted as Plaintiff's Exhibit 4, from Ms. Senall, Senior Property Manager of the HBW Group, to appellant. Ms. Senall had previously testified that she sent the letter to appellant, which letter confirmed receipt of

NIVD's proposed demolition and build-out plans, and requested that, "prior to commencing demolition and construction," appellant provide Loflane copies of the required permits as well as a certificate of insurance from the contractor. Appellant testified that he never received the May 14, 2008 letter.

Appellant testified that he created, from his Verizon cellular telephone bill (admitted as Defendant's Exhibit 35), a chart or "summary" of all of the telephone calls made to HBW and Richard Ireland (admitted as Defendant's Exhibit 22) with regard to the leaks. Appellant testified that he called HBW on June 9, 2008, to complain about "leaks in the property to Mr. Coleman [who] was Ms. [Senall's] personal secretary." He stated that it was on that date that he first discovered the leaks. According to appellant, Mr. Coleman did "[n]othing" in response.

The summary next purported to show a 4–minute call on June 24, 2008, at 3:24 p.m., again to Mr. Coleman. Appellant testified that he called Mr. Coleman to complain that he "was unresponsive and was not returning [his] calls and was not taking any action on [his] issues." According to appellant, there was still water on the premises.

The summary also showed calls on June 25 and 27, 2008, to the HBW office. Appellant stated that he was again calling to complain about the "water problems." With regard to the June 27 call, the summary showed that appellant placed the call to HBW at 2:31 p.m., and approximately an hour and 17 minutes after that call, appellant placed a one-minute call to Richard Ireland. Apparently in an effort to prove an agency relationship between Mr. Ireland and/or Biocon and HBW, the following colloquy ensued between counsel for both NIVD and appellant, and appellant:

Q. All right, and this one-minute call is a call you placed to Mr. Ireland?

A. That's correct.

Q. Now, why did you place a one-minute call to Mr. Ireland?

A. After I made the complaint [to HBW] on the 27th, which was the same day I made that one-minute call, he shows up in the premise.

Q. Who is the he?

A. Mr. Ireland shows up on the premise, he introduces himself.

* * *

Q. Mr. Ireland comes an hour and 17 minutes after you have called the HBW office complaining about this leak, Mr. Ireland appears.

A. Correct.

Q. All right, why is if you're talking to Mr. Ireland you place a one minute call to Mr. Ireland?

* * *

A. I got his phone number verbally from him and I actually punched in the phone number into my phone so I would have it in my phone....

* * *

Q. Okay, and so at this point, roughly an hour and 17 minutes after you had called with yet another complaint to HBW office, Mr. Ireland is face-to-face with you.

A. That's correct.

* * *

Q. Okay ... did you tell Mr. Ireland about the concerns you had with leaks on the premises?

A. That's correct.

Q. Okay, and did Mr. Ireland offer to remedy that at all?

A. Yes, he did.

Q. Okay, and did he remedy that?

A. Continually, yes.

Appellant testified that on September 8, 2008, he called HBW to make sure Ms. Senall was there so that he could drop off a rent check for August that he had been withholding from HBW due to the "continual problems with the space." After the call, he did, in fact, deliver the check at approximately 3:46

p.m. Ms. Senall did not mention to appellant that there had been a "leak of water on the 7th and 8th." [12] Appellant testified that he had not been on the premises on September 7th or 8th.

Appellant testified that after Loflane filed suit for possession of the property, he appeared in court. Nobody from Loflane or HBW told appellant that what they were seeking from him at that time were the keys to the property. The first time he heard anything about returning his keys was a "day before [he] actually turned them in" when he "learned that the token of relinquishing custody of the space was turning in your keys."

On cross-examination, appellant agreed that his testimony was contrary to the previous testimony of Mr. Ireland and Ms. Senall, but swore that he was not lying. He stated that he could not recall executing two affidavits, although he did remember being deposed under oath.

Appellant agreed that he had testified to the illness that his "wife" had sustained after she visited the premises, but affirmed that, in fact, he had not actually been married since 1993 and that he was not legally married to his "live-in" girlfriend, Ms. Greenbaum.

Appellant testified that he visited the premises "[a]t least twice" prior to renting it. On the first occasion, he visited the property with Mr. Mizell, his broker, and Mr. Patterson, Loflane's broker. He did not believe that Mr. Patterson visited the property on the second occasion. When counsel asked appellant whether, pursuant to his deposition testimony, Mr. Manoff had visited the premises with him prior to the

---

12. We were not provided with the testimony of Mr. Ireland or Ms. Senall. Apparently, there was "verifiable evidence" presented by Loflane of a water leak that occurred on September 7, 2008 in a water pipe in Biocon's premises, which leak was discovered on September 8, 2008. After discovery of the leak, Mr. Ireland, Biocon's maintenance engineer, was sent to the NIVD space to investigate whether any of that leaking water had entered the space. Mr. Ireland found a small puddle on the floor, and mopped it up. Mr. Ireland apparently testified that it was only potable water.

lease signing, appellant responded that he did not recall, but that he "must have been there if [appellant] said he was...."

When confronted with the lease agreement, appellant agreed that per the terms of the agreement, any structural changes, alterations, improvements, et cetera, required prior written consent of the landlord. He stated that he believed Loflane gave him written permission, by way of the May 14, 2008 letter from Ms. Senall, which was previously admitted as Plaintiff's Exhibit 34, to undertake the renovations on the property. He agreed that based on that letter, he felt that he was in compliance with the terms of the lease. Counsel then reminded appellant that he had previously testified that he never received the May 14 letter. Appellant responded that if that was what he said, then he did not receive the letter, but he maintained that he received permission to begin demolition, and that he "thought it was a verbal permission," notwithstanding the fact that the lease required written permission.

Appellant testified that he first became aware of the leaks on June 9, 2008, and first complained to HBW via Mr. Coleman on that date as well. When confronted with his deposition testimony wherein he had testified that he contacted Mr. Coleman in May, appellant admitted that he was not telling the truth at that time, but that his trial testimony was the truth.

Counsel questioned appellant with regard to the two telephone calls on June 27, 2008, one being to HBW and the other to Mr. Ireland, and the following transpired:

Q. And the 27th, you and your counsel spoke a lot about ... two calls on the 27th.

* * *

Q. And you remembered those very specifically, right?

A. That's correct.

Q. Tell me why you remembered those so specifically?

A. Because that's the first time I met Mr. Ireland.

Q. The second call.

A. Correct....

\* \* \*

Q. And you're sure you called HBW at 2:31 to complain about water?

\* \* \*

A. Yes....

\* \* \*

Q. You put the chart together. And that was a call that you're swearing here was to HBW to complain about water.

A. Yes.

Q. Okay, and then in response to that, somehow Mr. Ireland comes down.

A. Correct.

Q. Okay, so let's look at Defendants' Exhibit 35.

\* \* \*

Q. Defendants' Exhibit 35 is your phone bills, right?

A. That's correct....

\* \* \*

Q. And your chart which was admitted as Defendants' Exhibit 22 is reflective of the calls from that phone bill, right?

A. .... [Y]es.

Q. Okay, but you didn't call HBW at all on June 27th, did you?

\* \* \*

Q. There's a total of two calls on the 27th, right?

A. Correct.

Q. Not either one of them is to the HBW office, right?

A. That's correct.

Q. So this chart is wrong, correct?

A. On the 27th, yes, that's correct.

\* \* \*

Q. Everything you testified to on Thursday about this series of phone calls is not true, right?

A. That is not correct.

Q. Okay, did you call HBW office on June 27th?

A. No, I did not.

Q. Okay, so everything you testified about how you called them and then Mr. Ireland came down an hour and 17 minutes later is not accurate.

A. That's correct.

Appellant testified, nevertheless, that he first met Mr. Ireland on June 27, 2008, when Mr. Ireland "just showed up out of the blue," presumably, according to appellant, because of all of his complaints to HBW about the leaking water. When confronted with his affidavit, where he testified that he had visited the tenant upstairs, Biocon, after he and his wife had become ill after visiting the premises, and that he had first met Mr. Ireland at that time, appellant agreed that the statements were inconsistent.

With regard to the CAT scan appellant underwent after experiencing headaches from visiting the premises, appellant testified at trial that had occurred in January of 2009, following the initiation of Loflane's suit for unpaid rents in December of 2008. He agreed that he had not had a CAT scan done in July, August, September, October, November, or December of 2008. When confronted with his deposition testimony wherein appellant had testified that he had a CAT scan done in June, July, August, or September of 2008, appellant agreed that was not accurate.

Appellant agreed that he did not have any knowledge of a leak occurring in the Biocon premises on September 8, 2008. He agreed that he had delivered a rent check to Ms. Senall on that date, and that she did not mention a leak. He also agreed that after delivering the check, he went to Florida and did not return until September 14. Counsel again confronted appellant with his affidavit, where he swore that a "major leak" occurred on September 8, and that he had called HBW to complain. When confronted, appellant stated that he had been "mistaken as far as the time line," when he executed the affidavit, and that his trial testimony was true.

Appellant agreed that he was sued for possession of the premises, and attended a hearing in November. He agreed that he had told the jury that, at that time, he did not know that he had to return his keys in order to surrender the premises. He agreed that he had previously testified at trial that he had learned that he needed to surrender his keys one day prior to his doing so, November 24, 2008, which was two weeks after the possession hearing. Counsel then confronted appellant with his affidavit in which he stated that he was informed by an attorney, at the November 12 hearing, that if he turned over the keys he would not need an attorney, and that he promptly turned over the keys. Appellant agreed that the testimony he had given before the jury was not true.

At the conclusion of cross-examination, the court recessed. On its own initiative, the court determined appellant to be in direct criminal contempt of court, stating the following:

All right, we're going to begin our ... redirect of the testimony in just a moment. I have a preliminary matter I need to deal with and that deals with the testimony of the defendant in this case.

In 28 years of having tried cases and presided over cases, I can only think of one other occasion where a witness made so many false statements under oath, either prior to a hearing or during a hearing. In this case, the defendant has given false sworn testimony in court, in prior depositions, in prior sworn affidavits in an attempt to mislead the jury and to perpetrate a fraud on this [c]ourt. By his conduct, he has shown contempt and his disregard for this [c]ourt, this jury, this judicial system and process and has intentionally attempted to interfere with the administration of justice. This is not going to be tolerated by this [c]ourt.

Consequently, I am finding Mr. Espinosa in direct criminal contempt of this [c]ourt and I'm going to defer sentencing of this matter until the end of today's hearing.

* * *

Subsequently, appellant re-took the stand, and testified on redirect followed by recross-examination. At the conclusion of

the evidence, the court heard motions, including Loflane's motion for judgment, as well as a motion for sanctions. The court granted Loflanes' motion for judgment as to appellant's counter-claims for breach of quiet enjoyment and constructive eviction, which apparently carried with it an element of sanction. In doing so, the court stated:

> ... [T]he level of inaccuracy and false testimony given in this case is shocking; it is outrageous, to use a word that was previously used in this case; and completely inexcusable. And at this point, it leaves the record in such a state that it would be impossible for the jury to conclude when this person is telling the truth, and when he's not telling the truth; what to believe, and what not to believe.

> He's admitted on the stand multiple times that he didn't tell the truth in court, under oath; didn't tell the truth on, in prior documents when under oath. And so he doesn't really present himself as a person who understands the meaning of an oath, or the obligation to tell the truth, or the consequences of that, given the multiple times that's occurred in this case.

The court then revisited the contempt issue, and the following transpired.

> APPELLANT'S COUNSEL: ... I am not a criminal lawyer—
>
> * * *
>
> —and I do not feel that I am in a position adequately to represent Mr. Espinosa in such matters.
>
> * * *
>
> My request is that an opportunity be provided for criminal counsel to be retained, and for the hearing for any sanction to be withheld and stayed. . . .

> THE COURT: Okay. Well, at this point, this is a direct criminal contempt finding for actions that occurred in court, in front of my eyes. This is not a charge that we're going to have a trial on. There's already been a finding. And the only issue at this point is to give Mr. Espinosa the opportunity to say anything he'd like to say in mitigation, or you, on

his behalf, before I decide what to do about it in the next several minutes.

So if you're not representing him on this, I'll ask Mr. Espinosa what he has to say for himself about this issue.

MR. ESPINOSA: I do take the oath in court very seriously. Unfortunately, I did not have the opportunity to have some of the items in front of me when I did do my deposition. After we put the time line together, I did have a clearer understanding of the case and what had happened. And the, like I said, it was two years prior almost. And as we went through the time line, it refreshed my recollection to a more clearer state.

There was never any intent on my behalf to misrepresent anything that was going on in the case to . . . the [c]ourt, or to the plaintiff.

* * *

And to be in this position after my tenure of what I've been doing for the last 22-plus years, is causing me a great deal of pain. . . .

* * *

THE COURT: Do you understand the difference between giving an answer, "I don't know" or "I don't recall," and making affirmative statements to the jury that this is a fact?

MR. ESPINOSA: I do, yes, at this point. And I was under the impression when I said, "I don't know," that I was going to get some sort of recollection at that point.

THE COURT: There were so many numerous times in your testimony where you testified, "This is what happened. This is what I did. This is who I called. This is what they did." And you were presented with documentary sworn testimony directly to the contrary.

It gives me the impression that either you absolutely don't care about the truth, or you were completely lying. One of those two is the inescapable conclusion from what you did. Because there was ample documentation of your sworn testimony all over the place in this case where you gave prior statements. And when you came to court, you gave

completely contrary testimony, either lying to deceive the jury, or with total disregard to having given completely contrary information previously, under oath.

MR. ESPINOSA: I was ill prepared by, I did not get an opportunity to read my deposition recently.

\* \* \*

So when I was answering the questions, they were to the best of my knowledge at that time, Your Honor. And I was not trying to lie or deceive to anybody in the courtroom based on my testimony....

\* \* \*

The court then announced its disposition:

.... I've been sitting in court for 28 years as a lawyer and a judge, watching witnesses, observing what they say, how they say it. And what you did here today is probably the second-worst case of demonstrable, provable, false testimony that I've ever seen. There was one that was more egregious that was equally as provable.

Most time, stories that you hear from witnesses, they don't sound right, doesn't make any sense, but there's not enough evidence to prove the false statements.

I would say this is the second-worst case I've ever seen of provable, demonstrable false testimony, either in court or in prior affidavits, or in prior answers to interrogatories. I guess the thing that is most offensive to the [c]ourt is the fact that you're a sworn law enforcement officer that should understand the implications of ... taking an oath, and that people rely on, juries rely on it, courts rely on it, witnesses rely on it, our general public relies upon it. And to make the statements that you have made in this court that are either absolutely intentionally lies, or in complete disregard for the truth to meet your own needs in this case, in my view, is just outrageous.

So at this point, for having found you in direct criminal contempt of court, I'm going to impose a sanction of 10 days to the Montgomery County Detention Center.

I will tell you that based upon your comments here today, you have saved yourself a significant amount of time, because when we came out earlier, I was going to give you a significantly longer sentence.

The following day, the court revisited Loflane's motion for sanctions. The court imposed various evidentiary sanctions relevant to Loflane's claims, including a ruling that appellant's testimony, which was "inherently unreliable and legally insufficient," and various exhibits that were supported by his testimony, were not to be considered by the jury. The jury was so instructed.

After the case was submitted to the jury and after deliberations, the jury returned a verdict, finding that NIVD breached the lease, but used reasonable efforts to mitigate the damages, and that appellant breached the guarantee. The jury awarded damages in the amount of $43,228.84 against NIVD and $135,989.09 against appellant.

On June 25, 2010, appellant filed a petition to reconsider the finding of criminal contempt. In his petition, appellant argued that the court did not make any written findings either before or promptly after sanctions were imposed as is required by Maryland Rule 15–203(b), and that the court could not have summarily imposed sanctions on appellant pursuant to Maryland Rule 15–203(a), because the contempt committed by appellant did not interrupt the order of the court or interfere with the dignified conduct of the court's business. Appellant also argued that his right to counsel and due process rights were violated. A hearing was held on the same day, with appellant's newly-acquired criminal counsel appearing on his behalf.

Prior to the hearing, the court issued its written order of direct criminal contempt. In its order, the court explained that the essence of appellant's contemptuous conduct "involves the blatant false statements made during his in-court testimony ..., his June 2009 deposition ..., his February 13, 2009 affidavit ..., and his January 27, 2010 affidavit." The court

cited the following particular instances of false statements as the bases for its findings:

1. Appellant's in-court testimony regarding who was present with him when he visited the property prior to signing the lease. Appellant testified in court that Mr. Patterson and Mr. Mizell were with him, but agreed that if he had previously testified in his deposition that Mr. Manoff was with him, then that was probably accurate. According to the court, "[a]t no time in his deposition did he ever state that Mr. Patterson was present when the property was inspected. [Thus], [e]ither his testimony or his deposition testimony was false."

2. Appellant's testimony that he and his wife had become ill when they entered the premises, followed by his acknowledgment on cross-examination that he had not been married since 1993, and that Toba Greenbaum was not his wife.

3. Appellant's testimony in his deposition that he had a CAT scan in June, July, August or September of 2008, followed by his in-court testimony that he did not have a CAT scan until January of 2009, after being sued for unpaid rents. When confronted with his deposition testimony, appellant agreed that testimony was incorrect.

4. Appellant testified that he had obtained written permission from Loflane to alter the property via the May 14, 2008 letter. On cross-examination, however, when confronted with his deposition testimony that he never received that letter, appellant changed his story and stated that he thought he had verbal permission to undertake the renovations.

5. Appellant testified that he first became aware of the leaks on June 9, 2008, as compared to his deposition testimony, wherein he stated that he had become aware of the leaks in mid-May.

6. Appellant created a chart of telephone calls, which purported to show specific dates and times of phone calls that he had made to HBW to complain about the leaks. His actual cellular phone bill, however, showed no phone calls.

7. Appellant testified that Mr. Ireland came to the premises to deal with the leaking water on June 27, 2008, which he also later admitted was inaccurate.

8. Appellant testified that he did not go to the property on September 8, 2008, and did not know of any leak on that day. In his second affidavit, however, he had stated that he called HBW on September 8, 2008 because there was water pouring down the wall from the Biocon premises.

9. Appellant testified that he was not aware that he had to relinquish his keys after the hearing on November 12, 2008. He further testified that when he learned of that requirement, on November 24, 2008, he immediately turned over his keys. In his second affidavit, however, appellant stated that at the November 12 hearing, an attorney informed him that he was supposed to turn over the keys.

In its order, the court noted that there were "many other obvious instances of false and inconsistent statements ... made by Espinosa during his testimony," but that those paraphrased above were the "most egregious." The court went on to state that:

By filing false affidavits and giving false deposition testimony, Espinosa has attempted to rebut the claims made by the Plaintiff during the pretrial phase of the case by fraudulently creating the impression that there was a genuine dispute as to material facts. Based upon the false information in these documents, Plaintiff's prior Motion for Summary Judgment was denied, requiring that this time-consuming and expensive litigation continue.

The court concluded:

By providing false testimony during the trial, Espinosa has attempted to mislead the jury, and avoid paying the rents which he was obligated to pay under the lease that he signed. He has interfered with the administration of justice by giving false testimony during a trial in an attempt to prevent the Plaintiff from recovering its rightful contractual damages, as well as attempt to collect unjustified damages from the Plaintiff. In addition, this [c]ourt, its staff, three

lawyers, and seven jurors spent four days in a trial that should have never occurred. As a result of handling this case, this [c]ourt was unable to handle other matters on the docket, which affected the rights of other litigants. Espinosa's admission of making these false statements, without reasonable explanation, shows his very contempt and disregard for his oath and the dignity of this [c]ourt.

Thus, finding that appellant's action interrupted the order of the court and interfered with the dignified conduct of its business, the court found appellant in direct criminal contempt, and subjected him to summary imposition of sanctions. The court denied appellant's petition to reconsider the finding of criminal contempt, and this appeal followed.

## Discussion

As set forth above, on this appeal appellant makes three contentions: (1) that appellant's conduct, which did "not interrupt the order of the court and did not interfere with the dignified conduct of the court's business," was such as not to justify a direct criminal contempt under Rule 15–203(a)(2) and, thus, the imposition of summary contempt sanctions; (2) that the conduct was not "direct" pursuant to Rules 15–202(b) and 15–203(a)(1) because the court relied on evidence extrinsic to the jury trial before it, i.e., appellant's affidavits and deposition testimony, as part of the basis for its findings; thus, the court should have proceeded, if at all, under Rule 15–205, which section deals with constructive contempt and preserves an alleged contemnor's right to counsel; and, (3) that he was denied due process and the right to counsel. Appellant also argues that the evidence of his intent was legally insufficient to support the court's finding of criminal contempt.

The State counters that the court's action met the requirements of Rule 15–203 because he "offended the process and dignity of the court when he repeatedly made false statements in his pleading and trial testimony, which gave the fraudulent impression to the court that there was a genuine dispute of material fact." The State continues that during trial, appellant "filed, and relied upon, depositions, interrogatories, affida-

vits and trial exhibits," and when "examined on the accuracy of these representations, . . . repeatedly admitted that his statements were inaccurate or incorrect"; thus, on that record, the court rightfully concluded that the business and dignity of the court was interrupted. The State further opines that due to appellant's false statements as to material facts, the business and dignity of the court were interrupted, as the court relied on those false statements in denying Loflane's pretrial motions for summary judgment.

With respect to appellant's contention that the court based its findings on extrinsic evidence, the State counters that the court "repeatedly noted that the direct criminal contempt was based on 'actions that occurred in court, in front of [the court's] eyes.' " Moreover, appellant's pretrial pleadings and discovery materials were filed with the court so that they "might be considered by the court in making its rulings," and in any event, appellant admitted the falsity of his statements to the court. Thus, opines the State, the court's use of summary proceedings was proper.

We turn to the merits.

### 1. Direct criminal contempt and summary imposition of sanctions

To begin, we observe that Maryland Rule 15–203(a) provides:

The court against which a direct . . . criminal contempt has been committed *may impose sanctions on the person who committed it summarily* if (1) the presiding judge has personally seen, heard, or otherwise directly perceived the conduct constituting the contempt and has personal knowledge of the identity of the person committing it, and *(2) the contempt has interrupted the order of the court and interfered with the dignified conduct of the court's business.* The court shall afford the alleged contemnor an opportunity, consistent with the circumstances then existing, to present exculpatory or mitigating information. If the court summarily finds and announces on the record that direct contempt has been committed, the court may defer imposition

of sanctions until the conclusion of the proceeding during which the contempt was committed.

(Emphasis added). It is the requirement in (2) that is the subject of appellant's first contention.[13]

 Direct contempts—as opposed to constructive contempts, which we will discuss further, *infra*—may be summarily punished, meaning that ordinary due process rights may be "scaled back" in favor of "prompt and effective action necessary to address a disruption that threatens the proceedings." *Mitchell v. State,* 320 Md. 756, 762, 580 A.2d 196 (1990). Because of the deprivation of fundamental due process rights and criminal safeguards generally afforded a criminal defendant, however, the "power to immediately and summarily hold a person in contempt is awesome and abuses of it must be guarded against." *State v. Roll & Scholl,* 267 Md. 714, 732, 298 A.2d 867 (1973) (citing *Bloom v. Illinois,* 391 U.S. 194, 202, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968)). For that reason, summary contempt proceedings should be the exceptional case, and "are only proper in cases where the action of the alleged contemnor poses an open, serious threat to orderly procedure that instant, and summary punishment, as distinguished from due and deliberate procedures, is necessary. In other words, direct contempt procedures are designed to fill the need for immediate vindication of the dignity of the court." *Roll & Scholl,* 267 Md. at 733, 298 A.2d 867 (citing *Harris v. United States,* 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965); *Cooke v. United States,* 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925)). In *Johnson v. Mississippi,* 403 U.S. 212, 91 S.Ct. 1778, 29 L.Ed.2d 423 (1971), the Supreme Court explained that summary proceedings are appropriate in cases where "instant action [is] necessary," and "where immediate corrective steps are needed to restore order and maintain the dignity and authority of the court."

---

**13.** We will deal with Rule 15–203(a)(1) when addressing appellant's second contention, *infra.*

The offending behavior at issue in this case involves false statements in affidavits and depositions pre-trial, and giving false testimony during trial.[14] The question then becomes, did appellant's conduct—perjury—interrupt the order of the court and interfere with the dignified conduct of the court's business, such as to justify a direct criminal contempt finding and the resulting summary proceedings?

Appellant argues that cases in Maryland in which direct criminal contempt has been upheld, specifically, *Usiak v. State*, 413 Md. 384, 993 A.2d 39 (2010), *Smith v. State*, 382 Md. 329, 855 A.2d 339 (2004), and *Wilkins v. State*, 293 Md. 335, 444 A.2d 445 (1982),[15] have involved blatant and obvious disruptive behavior in the courtroom that expressly interrupted the conduct of court business, and that his behavior did not rise to that level, implicating the imposition of summary sanctions. We agree.

In *Usiak*, defense counsel—Usiak—appeared in district court on behalf of his client who was scheduled to go to trial that day. 413 Md. at 387, 993 A.2d 39. Usiak requested a continuance, which the court denied, but agreed to "pass" the case until later in the day. *Id.* When the case was later called, the State informed the court that it wished to place the case on the stet docket. *Id.* During a colloquy between the court and the State regarding the State's request, Usiak, apparently believing the court had no authority or discretion other than to grant the State's motion and conclude the proceedings, inter-

---

**14.** Appellant cites certain findings made by the court that he believes were clearly erroneous, i.e., the court's findings regarding who was present with him when visiting the premises prior to entering into the lease, and the court's findings regarding the existence of a "wife." Because we shall reverse the court's order of direct criminal contempt, we need not specifically address appellant's claims of error with regard to these two findings.

**15.** We observe that none of these cases explicitly involve the correctness of the court's finding of direct criminal contempt and the subsequent imposition of summary sanctions, as is the case here, but all provide support for appellant's proposition that his behavior did not rise to the level of the behaviors that have been found to be sanctionable immediately, so as to maintain dignified order in the courtroom proceedings.

rupted and asked to be excused. *Id.* at 388, 993 A.2d 39. The court denied Usiak's request to be excused, explained that it had not yet ruled, and informed Usiak that his behavior was "rude and disrespectful." *Id.* at 389, 993 A.2d 39. Nevertheless, Usiak continued to assert that the case was concluded, and continued to argue with the court. *Id.* at 389–90, 993 A.2d 39. After the court informed Usiak again that the case was not concluded and told him to have a seat in the courtroom, Usiak responded "we're leaving. . . ." *Id.* at 390, 993 A.2d 39. Usiak then walked out of the courtroom, and the court immediately held him in direct criminal contempt of court, for "interrupting with the flow of the [c]ourt's judicial proceedings," *id.* at 391, 993 A.2d 39, and sanctioned him with a fine.[16]

In *Smith*, a criminal defendant used profane expletives after being warned by the court that further use of such language would result in a contempt finding. 382 Md. at 334, 855 A.2d 339. The court found Smith in contempt for three separate occurrences of outbursts during the course of the hearing. *Id.* at 333, 855 A.2d 339. On appeal, Smith suggested that the court could not find him in contempt multiple times during a continuous proceeding, *id.* at 342, 855 A.2d 339, however, the Court of Appeals disagreed and concluded that because the "purpose of the contempt power is to allow a judge to maintain the dignity and orderly operation of the court," as long as "contempt convictions in a given case serve that purpose, it is not error necessarily for a judge to find the same individual

---

16. The contempt finding and sanction were appealed to the circuit court, which vacated and remanded the case based on procedural errors, specifically, that the district court did not comply with Maryland Rule 15–203 by specifying the evidentiary facts underlying the contempt finding. After remand, three months later, the district court entered a second, corrected order of contempt, which the circuit court subsequently affirmed. Usiak then appealed to this Court, and we transferred the case to the Court of Appeals. The Court of Appeals reversed, holding, in effect, that Rule 15–203 requires the sanctions order to be immediate, and that three months after the sanctionable conduct, the "justification for the summary nature of the contempt order had dissipated. . . ." *Usiak*, 413 Md. at 403, 993 A.2d 39. In reversing, however, the Court did not opine upon the merits of the direct criminal contempt finding.

multiple times in contempt...." *Id.* at 343, 855 A.2d 339. Appellant here maintains that, unlike in *Smith,* the trial court's "application of summary sanctions did not serve the purpose of maintaining the orderly operation of the court— any more than separately docketed proceedings would...."

In *Wilkins,* the criminal defendant informed the judge that if he—the defendant—was not removed from the courtroom, he would disrupt the trial. 293 Md. at 336, 444 A.2d 445. The court denied Wilkins's request, and advised him that if he was disruptive, he would be held in contempt. *Id.* Ignoring the court's warning, Wilkins began talking in "loud and vociferous tones" and continued to do so throughout the State's opening statements. *Id.* The following day, Wilkins again announced his intention to again disrupt the proceedings, and proceeded to do so by physically resisting sheriffs, cursing, and using loud, abusive language. *Id.* Wilkins had to be subdued by 4 to 6 individuals, and was ultimately removed from the courtroom. *Id.* At the conclusion of trial, the court cited Wilkins for four acts of direct criminal contempt, and summarily found him in contempt of court. *Id.*

The State, on the other hand, cites three cases from other jurisdictions, all of which involved direct contempt, for the proposition that "perjury may constitute criminal contempt." Accepting that perjury may constitute criminal contempt, under certain circumstances and if proved, and if those requirements were met here, the question would become whether, on these facts, it supports direct contempt. We think not.

The State cites *Blankenburg v. Commonwealth,* 272 Mass. 25, 172 N.E. 209 (1930), which it suggests is "instructive" in this case on the issue of "special circumstances surrounding" perjurious conduct to establish criminal contempt. In *Blankenburg,* a contemnor was adjudged in criminal contempt after making fraudulent representations that she was a direct heir entitled to proceeds in probate. *Id.* at 210. After making the fraudulent representations, the contemnor was arrested, and required to appear in court four days later to show cause why she should not be adjudged in contempt and to furnish bond

for her appearance. *Id.* After giving security for her later appearance, the contemnor was released. *Id.* Later, a hearing was held upon "arrest specifications" provided by the Attorney General. After that hearing, the court entered an order reciting "findings of fact of perjury, subornation of perjury and acts in obstruction of justice, and the arrest of the plaintiff in error in open court because of the acts thus committed by her in the presence of the trial judge. . . ." *Id.* The order also recited the notice given to the contemnor of the hearing on specifications of contempt, specifically that after the arrest specifications were filed, of which the contemnor had due notice, that she appeared with counsel and offered testimony on her own behalf. *Id.* Only thereafter was the contempt adjudication made. *Id.*

On appeal, the Supreme Judicial Court of Massachusetts upheld the contempt finding, stating:

> There is much more shown on this record than mere perjury of an ordinary witness: it was beyond doubt perjury under exceptional conditions *with added elements of obstruction to the court.* The plaintiff in error was a moving party in this aspect of the litigation. She was seeking without justification to interject herself as a party into litigation concerning the proof of a will by knowingly and wilfully asserting a false claim to be a daughter of alleged testatrix. Many days of the time of the court and of other actual parties had been consumed in hearings on that point. *The judge made findings as to the means of proof put forward by her and other measures taken by her in support of such fraudulent claim,* which have been narrated.

*Id.* at 211–12 (emphasis added).

The State cites the foregoing passage, comparing it to the circuit court's conclusion that appellant interfered with the administration of justice and misused the court's time, affecting the rights of other litigants. In *Blankenburg,* however, unlike in the present case, a review of the relevant facts reveals that there was substantial time between the contemptuous conduct and the finding of contempt. Indeed, the

contemnor in that case had notice and an opportunity to be heard with counsel present, which circumstances are more akin to our constructive criminal contempt procedure, and which requires a separate proceeding, the right to counsel, service of a summons or warrant, and other due process rights. *See* Maryland Rule 15–205. Moreover, in this case, there was no demonstrable immediate obstruction to the court in the performance of its duty in the civil case.

Similarly, in *People v. Page*, 73 Ill.App.3d 796, 29 Ill.Dec. 854, 392 N.E.2d 411 (1979), the contemnor was held in criminal contempt after making false statements to the court regarding ownership of personal assets. *Id.*, 29 Ill.Dec. 854, 392 N.E.2d at 412. After the contemnor failed to satisfy a judgment that was entered against him on June 1, 1977, a citation to discover the contemnor's assets was filed. *Id.* At that hearing, on August 17, 1977, the contemnor testified to owning a television and a stereo, and the court issued a writ of seizure for that property. *Id.* After the property was seized pursuant to the writ, a second hearing was held on December 14, 1977. *Id.* At the second hearing, the contemnor again acknowledged that he owned the television and the stereo. *Id.* On December 22, 1977, however, the contemnor's wife filed a petition to intervene seeking to set aside the order of seizure. *Id.* A hearing was held on that petition on December 29, 1977, at which it was established that the television and the stereo were the personal property of the contemnor's wife. *Id.* The contemnor's wife further stated that if anyone had testified to the contrary, such testimony would have been false. *Id.* On January 6, 1978, another hearing was held on the petition to intervene. *Id.*, 29 Ill.Dec. 854, 392 N.E.2d at 412–13. At that hearing, the contemnor admitted that his wife's testimony was true, and that his prior testimony had been false. *Id.*, 29 Ill.Dec. 854, 392 N.E.2d at 413. Subsequently, the court held a contempt hearing on February 10, 1978, and found the contemnor in direct contempt. *Id.* In *Page*, as in *Blankenburg*, substantial time elapsed between the conduct and the finding of contempt and punishment, again, more like our constructive criminal contempt procedure.

In *State v. Terry*, 149 N.C.App. 434, 562 S.E.2d 537 (2002), also cited by the State, the contemnor was found in direct criminal contempt and summarily punished after testifying falsely at a probation revocation proceeding. *Id.* at 538. As a condition of probation, the contemnor was to report to the detention center on weekends. *Id.* The contemnor stated under oath, in a motion to modify the conditions of her probation, that she had a mandatory Saturday class that interfered with her weekend sentence. *Id.* at 539. In the meantime, the contemnor's probation officer filed a report alleging that she had violated the conditions of her probation. *Id.* A hearing was held on the contemnor's motion as well as on her alleged probation violation. *Id.* At the hearing, the contemnor again testified that she was unable to report for her weekends due to her mandatory class. *Id.* The contemnor's probation officer contacted her professor, and was informed that the contemnor was not required to take a mandatory class, and the court heard testimony in that regard. *Id.* Nevertheless, the contemnor continued to insist that she had a mandatory weekend class. *Id.* After the court admonished the contemnor for being untruthful, she admitted that she had lied. *Id.* Subsequently, the court found the contemnor in direct criminal contempt. *Id.*

*Terry* is closer to the situation before us than the other cases relied on by the State. We note, however, that in *Terry*, the contemnor's perjurious statement, resulting in a finding of direct criminal contempt, was directly to the court. In any event, applying Maryland Rules and case law, we are not persuaded by the *Terry* decision that the circuit court's finding should be affirmed.

 The end result is that, while we agree that under certain "special" circumstances perjury may be a basis for contempt, Maryland Rule 15–203(a); *Blankenburg*, 172 N.E. 209, 211 (providing that "[a]n obstruction to the performance of judicial duty resulting from an act done in the presence of the court is, then, the characteristic upon which the power to punish for contempt must rest."); *Ex parte Holbrook*, 133 Me.

276, 177 A. 418, 421 (1935) (providing that "[w]hen the answers of a witness amount to the crime of perjury, the offender may be guilty of contempt provided there is also some obstruction of justice in addition to the necessary elements of that crime . . . .") (collecting cases), the perjury has to be clear and, for direct criminal contempt, there must be some immediate obstruction to the court in the performance of its duty.

■ In accord with those principles, we conclude that something more than a finding that the contemnor has lied during the course of adversarial proceedings is necessary for criminal contempt because the very "fact-finding" nature of court proceedings is to resolve differences in testimony, and judge the credibility of the witnesses. In jury trials, the jury is the factfinder. As to the *direct* criminal contempt procedure, there is no need to employ it, absent an immediate obstruction.

In the case before us, during a jury trial where the jury was the finder of facts, appellant admitted he lied during the course of his testimony. The lie was to benefit himself in the outcome of the civil proceeding. Appellant was not disruptive or disrespectful and engaged in no conduct which interfered with the orderly handling of the civil proceeding, as did the contemnors in *Usiak, Smith,* and *Wilkins.*

The necessity for immediate action was in the handling of the civil proceeding, which was still pending, and the court addressed that by imposing sanctions on appellant in that proceeding. The conduct of the civil proceeding to a conclusion was not disrupted. While appellant's conduct was reprehensible, there was no need to proceed in a summary fashion under the direct criminal contempt Rule. Needless to say, the same is true with respect to the denial of the summary judgment motion, which occurred prior to trial. The court could have just as effectively proceeded under Maryland Rules 15–204 [17] and 15–205, which we shall briefly discuss in the next section.

---

**17.** Maryland Rule 15–204 provides:

The extraordinary summary procedure of direct criminal contempt should be used only when necessary to punish someone who, at the time of the finding, is interfering with the orderly conduct of the court's business. Appellant's conduct did not meet the requirement in Rule 15–203(a)(2), and therefore, we must reverse. We now turn to the issue raised by appellant with regard to whether the court's finding of contempt was appropriately classified under Rule 15–203(a)(1).

### 2. *Direct contempt requires personal knowledge*

Maryland Rule 15–202 provides:

(a) **Constructive contempt.** "Constructive contempt" means any contempt other than a direct contempt.

(b) **Direct contempt.** "Direct contempt" means a contempt committed in the presence of the judge presiding in court or so near to the judge as to interrupt the court's proceedings.

■ As set forth above, Rule 15–203(a) provides that a court "may impose sanctions on the person who committed it summarily if," along with the requirement in 15–203(a)(2), "(1) the presiding judge has personally seen, heard, or otherwise directly perceived the conduct constituting the contempt and has personal knowledge of the identity of the person committing it." Summary sanctions are not appropriate unless both requirements are met. The inability to impose summary sanctions, however, does not preclude the court from imposing sanctions via other Rules.

■ Where criminal contempt is not direct, it may be deemed to be constructive because it was not committed in the presence of, or near to, the judge. In the alternative, a court may determine not to impose sanctions summarily in the event

---

**Direct contempt if no summary imposition of sanctions.** In any proceeding involving a direct contempt for which the court determines not to impose sanctions summarily, the judge, reasonably promptly after the conduct, shall issue a written order specifying the evidentiary facts within the personal knowledge of the judge as to the conduct constituting the contempt and the identity of the contemnor. Thereafter, the proceeding shall be conducted pursuant to Rule 15–205....

of a direct criminal contempt. Maryland Rule 15–204.[18] In either event, the proper procedure to be followed is found in Maryland Rule 15–205, rather than Rule 15–203. The procedures set forth in Rule 15–205, unlike the summary procedures, serve to preserve a criminal defendant's rights, i.e., due process, and counsel.[19] As noted above, appellant suggests that the court should have proceeded, if at all, under Rule 15–205, as a constructive contempt, because the court relied on extrinsic evidence.

The phrase "in the presence of ... the court" has been interpreted to mean when the contemptuous behavior "occurs within the sensory perception of a presiding judge," such that he or she has "sufficient knowledge of the ... act which tends to interrupt the proceedings and will not have to rely on other evidence to establish all the details, though some of them can be supplied by additional testimony." *Roll & Scholl,* 267 Md. at 734, 298 A.2d 867. In that case, the Court of Appeals concluded that contempt proceedings against the two contemnors should have been conducted as constructive, rather than direct, proceedings.

The offending behavior of each of the contemnors occurred when, after being summoned, they adamantly refused to testi-

---

**18.** *See* n. 19, *supra.*

**19.** Rule 15–205 provides, in part:

**Constructive criminal contempt; commencement; prosecution.**
(a) **Separate action.** A proceeding for constructive criminal contempt shall be docketed as a separate criminal action. It shall not be included in any action in which the alleged contempt occurred.
(b) **Who may institute.** (1) The court may initiate a proceeding for constructive criminal contempt by filing an order directing the issuance of a summons or warrant pursuant to Rule 4–212.
\* \* \*
(d) **Contents; service.** An order filed by the court pursuant to section (b)(1) of this Rule ... shall contain the information required by Rule 4–202(a). The order ... shall be served, along with a summons or warrant, in the manner specified in Rule 4–212....
(e) **Waiver of counsel.** The provisions of Rule 4–215 apply to constructive criminal contempt proceedings.
(f) **Jury trial.** The provisions of Rule 4–246 apply to constructive criminal contempt proceedings.

fy before a grand jury. *Id.* at 718, 298 A.2d 867. After each instance of contemptuous conduct, the State submitted a "Petition for Direct Contempt" to the circuit court, seeking to have the contemnors punished. *Id.* at 720, 724, 298 A.2d 867. The petitions also requested that the contemnors be required to show cause why they should not be held in "direct contempt." *Id.* at 720, 724, 298 A.2d 867. Subsequently, the contemnors were brought before the circuit court, and the State presented evidence in an attempt to establish its case. *Id.* at 721, 724, 298 A.2d 867. In so doing, the State called the forelady of the grand jury to testify, as well as the clerk to the grand jury, who read the transcript of the proceedings to the circuit court. *Id.* at 721, 724, 298 A.2d 867. After the hearings, the circuit court found both contemnors in direct contempt and imposed sentence. *Id.* at 723, 725, 298 A.2d 867. On appeal, the Court of Appeals stated that, "[w]hen, as in the case here, the judge does not have personal knowledge of the facts and must learn of them totally from others, direct contempt proceedings are not authorized." *Id.* at 734, 298 A.2d 867. The Court expounded that the "reason such proceedings are not permitted is that there is no need for summarily disposing of an alleged contempt when the behavior of the accused is not personally known to the judge or does not occur so near to the court as to interrupt proceedings then being conducted by the judge." *Id. See also Murphy v. State,* 46 Md.App. 138, 146, 416 A.2d 748 (1980) (providing that "the resort to additional testimony does not indicate that a contempt is constructive; it is the contemptuous act itself which is determinative.").

 What *Roll & Scholl* makes clear is that a judge must have personal knowledge of all the relevant facts. *Scott v. State,* 110 Md.App. 464, 677 A.2d 1078 (1996), explicates that a contempt is not direct "if the trial judge does not have personal knowledge of all of the relevant facts . . . .," *id.* at 480, 677 A.2d 1078, and that in such a case, "where the judge must look at extrinsic evidence to determine that a contempt has been committed—the contempt is constructive rather than direct." *Id.* at 481, 677 A.2d 1078; *see also Dorsey v. State,* 295 Md. 217, 223–26, 454 A.2d 353 (1983). In other words,

*Scott* emphasizes that "if the trial judge, while presiding over his courtroom, is able to obtain personal knowledge of all of the relevant facts, the contempt is direct; by contrast, if the trial judge, while presiding over his courtroom, is not able to obtain personal knowledge of all of the relevant facts, and must rely on extrinsic evidence, the contempt is constructive." *Scott*, 110 Md.App. at 485, 677 A.2d 1078. In this case, the former situation exists.

Here, the court found that the offending conduct resulting in direct contempt was the making of false statements in affidavits and depositions pre-trial and giving false testimony during trial. Clearly, the false testimony in court, before the trial judge, satisfies the judge's personal knowledge require-ment as to that conduct. The question becomes, however, whether the court's consideration of appellant's pre-trial lies violated the personal knowledge requirement. We conclude, here, that it does not. Of importance, the pre-trial testimony was used extensively during the trial, on cross-examination, for impeachment purposes or otherwise; thus, providing the trial court with personal knowledge of the relevant facts. Moreover, prior to trial, the court also considered the affida-vits and deposition when it considered Loflane's renewed motion for summary judgment. We are satisfied that the court did not rely on extrinsic evidence.

We observe, however, that it will be a rare situation in which a direct criminal contempt can be based on lying as to the subject matter of the case because whether one is lying as to relevant facts in the case is usually for the fact-finder deciding the merits, and absent an admission, as here, evi-dence is unlikely to be sufficient to sustain a finding of contempt. In addition, it would require a finding of some unusual circumstance to separate it from the normal factual differences in testimony that frequently occur in the conduct of litigation. Here, the falsehoods were numerous and admit-ted to be false.

### 3. *Due process and right to counsel*

In light of our conclusion with respect to the impropriety of imposing summary sanctions in this case, we need not address

appellant's contentions with respect to violations of due process and right to counsel.

### 4. *Sufficiency of the evidence*

■ Finally, and somewhat in passing, appellant appears to contend that the evidence was not legally sufficient to find the requisite mens rea beyond a reasonable doubt. According to appellant a "troubling aspect" of the trial court's order of contempt "is that there is no reference to findings of contumacious intent with respect to the appropriate standard of beyond a reasonable doubt," and without "setting forth a factual predicate on [a]ppellant's intent," which can not be inferred from "[a]ppellant's giving of testimony that the court found to be inconsistent with prior testimony," the court "simply deemed [a]ppellant's testimony to be fraudulent in nature and intended to mislead the jury."

■ In order to find someone guilty of a direct criminal contempt, the behavior must be contemptuous on its face or it must be shown that the person possessed contumacious intent. *Cameron v. State,* 102 Md.App. 600, 608, 650 A.2d 1376 (1994). To evaluate the sufficiency of the evidence to find the requisite intent, we must review the case on both the law and the evidence. *Wilson v. State,* 319 Md. 530, 535, 573 A.2d 831 (1990). In making this inquiry, we will not set aside the trial court's findings of fact unless they are clearly erroneous. Maryland Rule 8–131(c). We must determine "whether the evidence shows directly or supports a rational inference of the facts to be proved, from which the trier of fact could fairly be convinced beyond a reasonable doubt of the defendant's guilt of the offense charged." *Wilson,* 319 Md. at 535–36, 573 A.2d 831.

With that in mind, and putting aside the other issues resulting in reversal of the direct contempt methodology, we have little difficulty in concluding that the evidence was legally sufficient to permit a finding of contumacious intent, based on appellant's own admissions and sworn documents. The circumstances here were unusual and sufficient in that the

nature and extent of the lying, as found by the court, was so extensive and pervasive that it could constitute the basis for a contempt finding.

### 5. *Conclusion*

In sum, we conclude that the evidence was sufficient to find contempt in this case based on appellant's perjurious conduct. The contempt was committed in the presence of the trial court; however, the court could not proceed summarily because the contempt did not meet the second requirement of Maryland Rule 15–203(a), in that it did not interrupt the order of the court and did not interfere with the dignified conduct of the court's business. Thus, the court was required to follow the procedures in either Rule 15–205 or Rule 15–204.

**JUDGMENT REVERSED. COSTS TO BE PAID BY MONTGOMERY COUNTY.**

